UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| CHANDLER ADAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:19-cv-00287 |
| | ) | Judge Aleta A. Trauger |
| BRIDGESTONE AMERICAS TIRE | ) | |
| OPERATIONS, LLC and BROADWAY | ) | |
| ELECTRIC SERVICE CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# MEMORANDUM AND ORDER

Bridgestone Americas Tire Operations, LLC ("BATO") has filed a Motion for Summary Judgment (Docket No. 66), to which Broadway Electric Service Corporation ("BESCO") and Chandler Adams have filed Responses (Docket Nos. 86 & 88), and BATO has filed a Reply (Docket No. 93). For the reasons set out herein, BATO's motion will be denied.

## I. BACKGROUND

BATO operates a tire plant in La Vergne, Tennessee. Adams was an employee of BATO contractor A Bee C Service, Inc., which did business as Service Tech Corporation. BATO contracted with Service Tech to perform certain specified equipment cleaning at the LaVergne plant on a recurring basis. On August 22, 2017, Adams was cleaning or examining the exhaust ductwork and fan of a rubber mixing unit, Mixer 622, when power was suddenly restored to the mixer, causing it to begin operation. (Docket No. 89 ¶ 1.) According to Adams' Second Amended Complaint, he was "pulled into the large industrial blades of the fan which were now spinning with great speed and force." (Docket No. 48 ¶ 31.) His injuries were "catastrophic." (*Id.* ¶ 20.) Although those injuries are the ultimate subject of this lawsuit, the present motion is concerned primarily

with the relationship between Service Tech and BASCO and how that relationship bears on BASCO's potential liability under Tennessee law.

The parties have provided a 2014 Mixing Duct Cleaning Scope of Work propounded by BATO to describe the work it was seeking for the job ultimately granted to Service Tech. (Docket No. 66-2.) The Scope of Work describes the services being sought as follows:

> Overall mixing duct cleaning activities shall include the creation of access ports where needed, creating patches and installing them over the created ports. Work will also consist [of] cleaning all duct work down to exposed metal, in addition to documenting cleaning activities with photographs.
>
> The contractor will be responsible for all aspects of this portion of the project including but not limited to providing project management, skilled supervision and skilled labor. The contractor shall provide all labor for all work . . . . The contractor is responsible for project management to coordinate all aspects of this portion [of] the project during the shutdown mixer replacement period so as to successfully complete the work.

(*Id.* at 4.)

Service Tech submitted a proposal to BATO related to the cleaning aspects of the described services. Service Tech proposed that it would furnish "all necessary mobilization, supervision, labor, and equipment to provide" the cleaning of the system. (*Id.* at 10.) The companies agreed to proceed with the relationship, and BATO ordered work from Service Tech pursuant to purchase orders that incorporated Standard Terms and Conditions for BATO contractors. Among those terms and conditions was that the contractor maintain workers' compensation insurance. (*Id.* at 17.) The Terms and Conditions also forbid the contractor from subcontracting with a third party for any portion of the covered work without BATO's permission. (*Id.* at 18.)

BATO has provided a Declaration by Dan Wright, who was the Plant Engineer for the La Vergne Plant from August 2012 to April 2018. (Docket No. 66-1 ¶ 1.) Wright characterizes "inspect[ing] and clean[ing] the exhaust fans and duct work" as "one specific item" of the

2

Case 3:19-cv-00287   Document 103   Filed 05/04/20   Page 2 of 12 PageID #: 1066

"[r]egular preventative maintenance and cleaning" that "is essential for the plant to continue to operate safely and effectively, and to produce high quality products." (*Id.* ¶¶ 4, 6.) Wright points to a document titled "BA TO Engineering Standard ES-MS-000-0015-01, Maintenance Standard, Dust Collector and Exhaust Duct Maintenance, Duct Inspection and Cleaning Standard" ("Duct Inspection and Cleaning Standard"), which mandates annual inspection and cleaning of the ductwork. (Docket No. 70 at 5.) According to Wright, the Duct Inspection and Cleaning Standard has been in place since 2014. (Docket No. 66-1 ¶ 6.)

According to Wright, "BATO regularly retains contractors to perform many jobs throughout its La Vergne plant, including regular cleaning and preventative maintenance of plant equipment. BATO engineering and maintenance employees regularly work side by side with contractors." He characterizes working alongside maintenance contractors as "a regular part of BATO's operation of the La Vergne plant . . . for many years." (*Id.* ¶ 7.) Wright claims that the work Adams was performing when he was injured was part of the "regular preventive maintenance and cleaning" of the plant. (*Id.* ¶ 9.) Wright, however, does not specifically allege that BATO employees worked alongside Service Tech employees with regard to the specific exhaust system cleaning work that Service Tech performed.

Adams disputes that the cleaning work that Service Tech performed was an ongoing, integral part of the functioning of the La Vergne plant. Specifically, Adams points to deposition testimony by Wright that the 622 Mixer had been operated in the plant since the 1970s, but that Wright had no specific knowledge of any regular cleaning of the duct work prior to 2014. Rather, he stated only that he had heard "stories" that it was "cleaned once or twice way back" on an "as-need[ed] basis." (Docket No. 89 ¶ 2; Docket No. 93-2 at 35–36, 97.) During his deposition, Wright was uncertain how many times the cleaning had actually been performed since 2014 and testified

3

that, despite the policy calling for regular yearly cleaning, it was "not unusual for things to get moved back or forward some number of months." (Docket No. 89 ¶ 2; Docket No. 93-2 at 109–11, 284.) Wright testified that, to his knowledge, no Bridgestone employee had ever entered the fan to clean it and that it was up to Service Tech to determine how the cleaning of the exhaust system would be performed. (Docket No. 89 ¶ 4; Docket No. 93-2 at 88, 161; Docket No. 94 ¶ 22.)

For the purposes of summary judgment, BATO concedes that it "did not supervise any of the cleaning work, and did not provide any of the labor for cleaning the ducts on the date of the accident." (Docket No. 94 ¶ 23.) Wright was asked during his deposition whether BATO had any internal employees qualified to perform the cleaning, to which he responded, "No, not really." (*Id.* ¶ 27; Docket No. 93-2 at 145.) Wright agreed that cleaning the fan was "pretty specialized work." (Docket No. 93-2 at 150; Docket No. 94 ¶ 29.) BATO concedes, for the purposes of summary judgment, that Service Tech was responsible for providing the equipment for the job and that the equipment used included a full HAZMAT suit, a headlamp, and respirator, all of which Adams used while cleaning the fan. (Docket No. 94 ¶¶ 33–34.)

On August 21, 2018, Adams filed his original Complaint in this lawsuit, naming BATO as the sole defendant. (Docket No. 1.) He filed a First Amended Complaint on July 9, 2019 (Docket No. 40), followed by a Second Amended Complaint on August 14, 2019 (Docket No. 48). The Second Amended Complaint names as defendants BATO, Service Tech, and BESCO, the electrical contractor allegedly at least partially responsible for restoring the power to the mixer. (Docket No. 48 at 1.) Although he alleges three "Counts," his Counts II and III are only statements of damages sought regarding Count I, for negligence. (Id. ¶¶ 41–56.)

4

On October 16, 2019, Adams filed a Stipulation of Dismissal Without Prejudice with regard to Service Tech. (Docket No. 80.) Adams and Service Tech agreed:

> The parties stipulate that Service Tech employed Chandler Adams at the time of the incident and injuries claimed in this case such that Plaintiff's claims and Defendant's defenses against Service Tech are barred by the workers compensation exclusive remedy provisions of Tennessee law, pursuant to Tenn. Code Ann. §§ 50-6-108 and 50-6-113, and as a result that comparative fault may not be apportioned to Service Tech, pursuant to Tennessee law.

(*Id.* at 1.) Bridgestone has filed a Motion for Summary Judgment (Docket No. 66), arguing that it is entitled to the same immunity from fault that, Adams has stipulated, covers Service Tech.

## **II. LEGAL STANDARD**

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is

5

"genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

### III. ANALYSIS

BATO argues that it is legally exempt from liability for Adams' injuries pursuant to the exclusive remedy provision of Tennessee workers' compensation law, which mandates that "[t]he rights and remedies granted to an employee subject to this chapter, on account of personal injury or death by accident, . . . shall exclude all other rights and remedies of the employee, . . . at common law or otherwise, on account of the injury or death." Tenn. Code Ann. § 50-6-108(a). "Pursuant to this section, workers' compensation law provides the exclusive remedy for an employee who is injured during the course and scope of his employment, meaning the employee is precluded from seeking tort damages for the injury" from his employer. *Valencia v. Freeland & Lemm Constr. Co.*, 108 S.W.3d 239, 242 (Tenn. 2003) (citing *Liberty Mut. Ins. Co. v. Stevenson*, 368 S.W.2d 760 (1963)).

The parties agree that BATO was not Adams' direct employer. Under Tennessee law, however, the responsibility to provide workers' compensation benefits—and the resulting immunity from tort liability—extend beyond the direct employer and the traditional employer-employee relationship. Section 50-6-113 of the Tennessee Code provides, in pertinent part:

> A principal contractor, intermediate contractor or subcontractor shall be liable for compensation to any employee injured while in the employ of any of the subcontractors of the principal contractor, intermediate contractor or subcontractor and engaged upon the subject matter of the contract to the same extent as the immediate employer.

Tenn. Code Ann. § 50-6-113(a). In accordance with these provisions, "if a subcontractor's employee is injured on premises under the principal contractor's control, the principal

contractor"—as a "statutory employer"—"is liable to that employee to the same extent as the subcontractor. That principal contractor, however, is immune to tort actions of that injured employee, to the same extent as the subcontractor." *Mathis v. Bowater Inc.*, 985 F.2d 277, 279 (6th Cir. 1993).

Not every relationship in which one company's employees perform a service for another company, however, falls into the principal contractor/subcontractor framework. Tennessee courts have therefore recognized that sometimes one company may perform work for another company without rendering the other company a principal contractor and, by extension, a statutory employer. "Generally, a company is considered a principal contractor if: (1) the company undertakes work for an entity other than itself; (2) the company retains the right of control over the conduct of the work and the subcontractor's employees; or (3) 'the work being performed by a subcontractor's employees is part of the regular business of the company or is the same type of work usually performed by the company's employees.'" *Lindsey v. Trinity Commc'ns, Inc.*, 275 S.W.3d 411, 421 (Tenn. 2009) (quoting *Murray v. Goodyear Tire & Rubber Co.*, 46 S.W.3d 171, 176 (Tenn. 2001)). If none of those conditions are met, then the company that hired the employee's direct employer is simply a customer, not a principal contractor, and any injuries resulting from that company's negligence will remain in the realm of ordinary tort.

It is undisputed that BATO was not performing work for another entity when it operated the La Vergne plant. Accordingly, the first avenue for establishing Service Tech as a subcontractor is unavailable. There is, moreover, little evidence that BATO retained the right of control over the conduct of Service Tech's employees. To the contrary, the available evidence suggests that Service Tech employees were free to accomplish their cleaning task as they saw fit. The second option for establishing Service Tech as a subcontractor is, therefore, also unavailable, at least as grounds for

7

summary judgment. BATO's motion, therefore, hinges on whether the undisputed facts demonstrate that Service Tech was a subcontractor pursuant to the third option, whether "the work being performed by a [its] employees [was] part of [BATO's] regular business . . . *or* is the same type of work usually performed by the company's employees.'" *Id.* (quoting *Murray*, 46 S.W.3d at 176) (emphasis added). Narrowing the inquiry further, there is no evidence that the cleaning that Service Tech performed was the same type of work usually performed by BATO's employees. To the contrary, there is strong evidence that BATO employees did not perform the same type of work performed by Adams and Service Tech. The determinative issue, therefore, is whether the cleaning was part of BATO's "regular business," despite its not being the type of work regularly performed by BATO's own employees.

In some cases, it may be obvious that the work performed by an alleged subcontractor's employees is part of the contracting company's "regular business." For example, if a manufacturing company relies on a third-party staffing company to staff the assembly line that forms the core of its ongoing business, then those workers would likely be held to be performing the regular business of the company. The phrase "regular business" does not, however, provide much guidance with regard to work that is ancillary to and supportive of a company's core business, such as equipment cleaning and maintenance. In one sense, cleaning and maintenance are just one portion of the ongoing operation of a business; in another sense, however, they are distinct, separate services, often performed by companies in a wholly distinct, specialized industry. The language of Tennessee's test leaves room for either interpretation. The court, therefore, will turn to Tennessee caselaw in an attempt to surmise what principles the Tennessee Supreme Court would likely apply to this situation. *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013) ("In resolving issues of [state] law, we look to the final decisions of that

8

state's highest court, and if there is no decision directly on point, then we must make an *Erie* guess to determine how that court, if presented with the issue, would resolve it.") (referring to *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)) (citation omitted).

BATO likens this case to *Fayette Janitorial Servs. v. Kellogg USA, Inc.*, No. W2011-01759-COA-R3CV, 2013 WL 428647 (Tenn. Ct. App. Feb. 4, 2013), which also involved a contractor injured while cleaning a piece of industrial equipment—in that instance, a corn cooker used by Kellogg in food production.[1] The Court of Appeals held that the cleaning work was part of the principal contractor's regular business but emphasized the highly context-dependent nature of its analysis. Among the facts that it found to be relevant was that the factory "ha[d] followed the same 28–day cleaning cycle for at least the last twenty years." *Id.* at *9. The court also relied on the fact that the cleaning "was essential to Kellogg's ability to produce safe, high-quality food products and necessary for the plant to operate properly, effectively, and in compliance with applicable safety regulations." *Id.* Because the cleaning was a routine, well-established practice integral to Kellogg's core business of food manufacturing, the court held, it was part of the company's regular business and Kellogg was a primary contractor and statutory employer. *Id.*

Adams has identified several grounds for distinguishing this case from *Fayette Janitorial*. First, the cleaning here was performed neither as regularly nor as frequently as the cleaning involved in that case. *See Dotson v. Bowater, Inc.*, No. 1:08-CV-191, 2009 WL 3584325, at *8 (E.D. Tenn. Oct. 26, 2009) ("One factor relevant to the 'regular business' inquiry is the frequency with which the type of work is carried out.") (M.J. op.). Second, the cleaning practice at the BATO

---

[1] Although a district court's duty in applying state law is to try to predict how a state's court of last resort would resolve an issue, the Sixth Circuit has instructed that "[a] federal court should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999) (citing *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967)).

9

plant had been in place for a much shorter period of time, and, at least based on the evidence currently before the court, it appears that the La Vergne plant may have gone decades without any regular cleaning of the type performed by Service Tech. Finally, BATO has produced no evidence establishing that Service Tech's cleaning work was as central to BATO's operations as the cleaning at the Kellogg plant was to food production. There is some limited evidence that BATO valued regular cleaning of its exhaust systems because cleaning reduced the likelihood of accidental fires. (Docket No. 93-2 at 118.) As important as that consideration may be, it is more removed from the core manufacturing process than the cleaning addressed by *Fayette Janitorial*. The evidence in that case showed that, without the contracted-for cleaning, it would be impossible to manufacture safe, legally sellable food products. There is no evidence, however, that the cleaning that Service Tech performed was necessary to the manufacturing of functional, safe, or regulatorily compliant tires. The testimony, rather, was that the exhaust system was in place simply to improve the air quality in the plant. (Docket No. 86-2 at 109.) Moreover, as Adams points out, the fact that the La Vergne plant went as long as it appears to have without regular cleaning of the system undermines any argument that the cleaning was strictly necessary for the La Vergne plant's operations.

The *Fayette Janitorial* court contrasted that case with the Tennessee Supreme Court's earlier opinion in *Murray v. Goodyear Tire & Rubber Co.*, 46 S.W.3d 171, which, like this case, involved work performed at a tire plant. The plaintiff in *Murray* was a painter who had been contracted to participate in an "extensive project of cleaning and painting the overhead air ducts" at the plant, during which he was injured. *Id.* at 173. The painter sought workers' compensation, and the tire manufacturer, Goodyear, argued that it was not his statutory employer. The Tennessee Supreme Court acknowledged that, "[u]ndoubtedly, regular maintenance, repair, painting, and

10

cleaning are an 'expectable, routine and inherent part of carrying on any enterprise.'" *Id.* at 176 (quoting *Smith v. Lincoln Mem'l Univ.*, 304 S.W.2d 70, 74 (1957)). Nevertheless, the court concluded that the manufacturer was not the plaintiff's statutory employer because the painting and cleaning "project could hardly be classified as a regular part of the employer's regular work, as the evidence presented at trial demonstrate[d] that it could only be completed at certain times, such as when the plant was not in operation." The Court also relied on the fact that there was "no indication that cleaning and painting overhead ducts some eighteen to twenty feet above the ground is the type of project that needs to be done on a continual basis." *Id.* at 176.

This case falls somewhere between the situations described by *Fayette Janitorial* and *Murray*. Unlike the painting at issue in *Murray*, this cleaning was a recurring practice. Nevertheless, it was considerably less regular and less central to the plant's operation than the cleaning in *Fayette Janitorial*. As in *Murray*, the work here involved "special equipment and special techniques" distinct from those involved in the "principal line of business [of] the manufacturing of automobile tires." *Murray*, 46 S.W.3d at 176. Those factors alone, therefore, do not mandate one particular conclusion under the "regular business" test.

Unfortunately, the evidence currently before the court is scant with regard to the key question of how necessary the cleaning truly was to the operation of the plant. One of the issues that Tennessee courts have treated as most important in the "regular business" analysis is whether the contractor's work is necessary for the relevant enterprise "to operate properly, effectively, and in compliance with applicable safety regulations." *Randolph v. Eastman Chem. Co.*, 180 S.W.3d 552, 558 (Tenn. Ct. App. 2005); *see also Griffith v. Jellico Cmty. Hosp., Inc.,* No. E2009-01431-COA-R3-CV, 2010 WL 2160775, at *6 (Tenn. Ct. App. May 28, 2010) (holding that hospital was contractor's statutory employer in part because licensing regulations required that the underlying

work be performed). Although there is some limited testimony about the risk of fires from dirty exhaust systems, there is no evidence of the severity of the risk or of any related regulatory requirements, and the fact that there appears to have been no regular cleaning for long periods of time weighs against the conclusion that regular cleaning was an ongoing necessity. *See Bray v. TVA*, 742 F. Supp. 2d 911, 916 (W.D. Tenn. 2010) (holding that primary contractor was statutory employer under the "regular business" test based in part on the fact that the same work had been performed routinely by the primary contractor's employees before transitioning to use of contractors). The mere fact that, as a general matter, exhaust work should be cleaned *to some degree* at *some point* to lower the likelihood of fires does not establish that this particular cleaning of this particular system was necessary to the plant's regular operation.

"Whether work is a regular part of the business of any entity is a fact-specific inquiry, relative to the size and scope of the business," as well as the nature of the work performed. *Lindsey v. Trinity Commc'ns, Inc.*, 275 S.W.3d 411, 422 (Tenn. 2009). As the party seeking summary judgment, BATO had the burden to set forth undisputed facts that resolved this issue in its favor. The facts currently before the court, however, leave considerable room for interpretation and inference with regard to the relationship between the exhaust system cleaning performed by Service Tech and the regular business of BATO. The court will therefore deny BATO's motion.

## IV. CONCLUSION

For the foregoing reasons, BATO's Motion for Summary Judgment (Docket No. 66) is hereby **DENIED**.

It is so **ORDERED**.

ALETA A. TRAUGER
United States District Judge